By the Court, Denio, C. J.
This is an appeal from a judgment of the Supreme Court, sitting in the first district.
*534 The complaint is in substance an information in the nature of a quo warranto. Its general object is to obtain a judgment upon the right of the defendants’ to execute the offices of “ commissioners of police,” to which they have been appointed pursuant to a statute passed at the last session of the legislature. The relator, Fernando Wood, claims that he, as mayor (together with the recorder and city judge of the city of New-York), is by law chargeable with and entitled to perform the duties of commissioners of police; and he alleges that the defendants have intruded into and usurped these offices. The special purpose of the action is to obtain a judicial determination as to the constitutional validity of the statute referred "to. The defendants have put in an answer, in which they set up their appointment under the act, and the? plaintiffs have demurred. The Supreme Court, holding the act constitutional, has overruled the demurrer and given judgment for the defendants; and the plaintiffs thereupon prosecute this appeal.
At the time of the adoption of the present constitution, the police of the city of New-York was regulated and governed, pursuant to an act of the legislature passed in the year 1844. The police force, according to.that act, consisted of a chief of police, captains, assistant captains, and policemen not to exceed eight hundred in number; and they were all appointed by the mayor and common council, and the assessors of the several wards. (Laws of 1844, ch. 315.) By an amendment of the city charter, passed in the /year 1849, a separate department was organized for police purposes, and tli;3 mayor was made its head. A chief of police was required to be appointed by the mayor, by and with the consent of the board of aldermen. (Laws of 1849, ch. 187, §§ 10, 20.) The act of 1844 does not provide for any officers having the name or the precise functions of the commissioners of police, as provided for by subsequent acts; but, after the adoption of the constitution, in 1853, the police department was reorganized by an act of the legislature, and *535 the mayor, recorder and city judge were constituted a board of commissioners of police; and to that board was committed the appointment and removal of the chief , of police, and of all the subordinates of the police force, and the duty of trying delinquent policemen. The mayor was made the head of police, as in the act of 1849. The act of the present year, under which the defendants derive their appointment, and the constitutionality of which is in question, is entitled “ An act to establish a Metropolitan Police District, and to provide for the government thereof.” (Ch. 569.) It unites the counties of New-York, Kings, Westchester and Richmond, in a district to be called “ The Metropolitan Police District of the State of New-York.” The governor, by and with the advice and consent of the senate, is required to appoint five commissioners of police; three from New-York, one from Kings county, and one from Richmond or Westchester, whose term of office is to be three years, but who are to be classified, so, that one shall be appointed in each year, and who are to be the chief officers of the said metropolitan police district; .and, together with the mayors of New-York and Brooklyn, are to form a board of police for the district, of whom three shall constitute a quorum. The board is to possess all the power and authority of the former board of commissioners of police of the city of New-York, including that of the mayor, recorder and city judge, as such commissioners, and all the powers of the mayors of New-York and Brooklyn as the heads of the respective police departments of their cities. The board is to appoint a chief clerk and six deputy clerks, and all the officers and men of the police force. That force is to consist of a general superintendent of police and two deputy superintendents, five surgeons of police, and so many captains and sergeants (within certain limitations), and so many police patrolmen as may be determined upon by the local authorities of the cities of New-York and Brooklyn, the remaining towns of Kings county and the counties of Richmond and Westchester; the supervisors of New-York
*536 Richmond and Westchester, and of the remaining towns of Kings county representing their counties for that purpose, and the common council of Brooklyn representing that city. Each county is to pay its proportion of the police force, but the funds are' to be paid into the state treasury,- and to be disbursed therefrom. The police force is authorized to “ do duty” in any part of the district, “ without regard to residence or county lines;” and its members are moreover to possess,- in every part of the state, all the common law and statutory powers of constables, except for the service of civil •process. They may execute warrants issued by any magistrate, without indorsement by another magistrate. There is to be a principal office of the board, located at such place in the district as the board shall- determine,- and the superintendent of police is to have an office in the same building. The two deputy superintendents are to have offices located where the board shall determine, except that one is required to have an office in the city of Brooklyn. The district is to be divided into precincts, not exceeding forty in number, and certain police officers are io be assigned to each. The use of the police property of New-York and Brooklyn is given to the board, but its ownership is declared not to be changed. The offices of the present chiefs of police of New-York and Brooklyn are abolished, upon the appointment of the superintendents of police under the act. The act runs into great detail, but the foregoing outline will be sufficient for the understanding of the questions which are to be considered. All former laws inconsistent with it are repealed.
The plaintiffs insist that the act is in conflict both with express provisions and with the general and particular arrangements of the constitution; Much of the discussion at the bar has turned upon the effect of the second section of the tenth article, which is here given at length. “All county officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of the respective counties, or appointed by the boards Of *537 supervisors or other county authorities, as the legislature shall direct. All city, town and village officers whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof as the legislature shall designate for that purpose. All other officers whose election or appointment is not provided for by this constitution, and all officers whose offices may hereafter be created by law, shall be elected by the people or appointed as the legislature may direct.” The principal question which arises upon this provision is whether the terms, county officers, and city, town and village officers, are limited to such officers whose offices existed at the time of the adoption of the constitution, pursuant to the laws of the state then in force; or whether they are a general description of a class of officers whose functions are to relate to the localities which are mentioned, without regard to the question whether the offices then existed by law, or might thereafter be instituted, and thus embracing both existing and future offices ? 'ing within that description. In determining this question we must keep in mind that the constitution was not framed -for a people entering into a political society for the first time, but for a community already organized and furnished with legal and political institutions adapted to all or nearly all the purposes of civil government; and that it was not intended to abolish' these institutions, except so far as they were repugnant to the constitution then framed. It was declared that all the acts of the legislature, then in force, and not repugnant to that constitution, should continue the law of the state, subject to such alterations as the legislature might make concerning the same. (Art. 1, 17.) By these acts, thus continued in force, a great number of offices had been created, and among them, and constituting numerically far the largest portion of all the functionaries of the state, were the county, city, town and village offices, by which the local government *538 was carried on. All the existing general and local offices were referred ..to in the constitution very much as they would be in an act of the legislature. For instance, in the provision immediately under consideration, the boards of supervisors are mentioned as a known county institution. Sheriffs and clerks of counties are referred to in the same manner in the first section of the tenth article. By the eighth section of the fourteenth article, the offices of supreme court commissioner, masters in chancery and examiners in chancery, which were simply statute offices, are,- among others, abolished. The convention must, therefore, be considered to have had in contemplation the existing official organization of the state; and it is to be understood as speaking of these local officers, whose future appointment they were providing for, either as existing legal functionaries, or in the general descriptive sense referred to, according as the scope of the provision to be construed shall require. With this understanding of the manner in which the constitution speaks of offices and officers the construction of this provision is plain. When, in this section, it speaks of county officers, and of city, town and village officers, whose election or appointment is not provided for by the constitution, and declares that they shall be elected or appointed by the local divisions to which their offices appertain, it refers to offices instituted and existing under the actual laws of the state. So in the next member of the sentence, where “ all other officers whose election, &c., is not provided for by this constitution,” are spoken of, the reference is equally to existing offices. This becomes apparent by that which- follows: “ And all officers whose offices may hereafter be created by law shall be elected by the people or appointed as the legislature may direct.” This last sentence embraces all offices thereafter to be created, whether their functions are local or general. By giving it this, its natural interpretation, and considering the previous clauses as confined to existing offices, the provision is intelligible and- harmonious; but if these clauses are not so limited, *539 there is an inevitable repugnancy. On the opposite construction, we h.ave a mandate that all existing local offices, and all offices which may be thereafter instituted, shall be filled by a local constituency, and at the same time a direction that those thereafter to be instituted shall be filled as the legislature shall direct. It will be perceived that four classes of officers are referred to in the section: First. Those whose election or appointment is provided for by this constitution. These are named only to be excluded from the direction to be given; Second. Existing local officers, the then present county, city, town and village officers : these are to be chosen by constituencies in their respective localities; Third. All existing officers whose election, &c., is not provided for by this constitution, and who are other than county, city, town and village officers; and, Fourth. All officers of every description, both local and general, whose offices were to be thereafter created by law. The two last classes are thrown into one, and the legislature is left free to provide for their election or appointment as it shall think most suitable.
It follows from what has been said, that if the offices mentioned in the municipal police bill have been created since the adoption of the constitution, the fact that they are filled by appointment by the governor and senate is not a violation of the portion of that instrument which we have been considering. But it is not enough to take the case out of the provisions of this section, that the names of offices existing when the constitution was adopted are afterwards changed by an act of the legislature, or that their functions are colorably modified. The constitution regards substance and not mere form. Now there was, anterior to the adoption of the constitution, a chief executive officer of the police, and a large number of captains, assistant captains and policemen, all of whom, except the chief, are declared to possess the power of marshals, and the chief was to possess the power of a justice of the police court. (Laws of 1846, 469, Art. 1 *540 §§ 2, 6; Art. 2, § 2.) All these officials were, I have no doubt, public officers; and they were, moreover, city officers within the meaning of the constitution. The superintendent of police, captains, sergeants and patrolmen, mentioned in the metropolitan police bill, are officials of the same character, possessing substantially the same powers and authorized to exercise the same functions as those heretofore existing under somewhat different names; and if appointed for the city of New-York, unconnected with the other territory annexed to it by this act, they should have been elected by the electors - of the city, or of some division of it, or appointed by some authority of the city. The police commissioners, assuming that they were themselves constitutionally appointed, cannot be regarded as authorities of the city within the meaning of the constitution. Hence it follows that if the provisions of the statute had been limited territorially to the city of New-York, it would have been in conflict with the section of the constitution so often referred to. The duty of the police force sought to be organized and governed was the sole public object of the enactment. If the appointment of this force in the manner directed by the act is constitutionally impossible, the whole scheme is frustrated. If the public duties with which the act charges the commissioners cannot be performed by them consistently with the constitution, their own appointment cannot be upheld; for public officers without the ability to perform public functions would be an absurdity. If the case stopped here, we should be compelled to hold that the commissioners were not entitled to execute the official functions which the previous laws committed to the mayor, recorder and city judge.
It becomes necessary, therefore, to inquire into the effect of the police district attempted to be created by this bill. If it is a valid organization, the officers appointed by the' bill are not county or city officers, but they are officers of the district thus organized; and whether the offices were created before or since the adoption of the constitution, the *541 mode "of appointment provided, is not in conflict with it. If the power to create the district for the purposes mentioned in the act exists, the officers authorized by it do not fall within the denomination of county officers, or of city officers. It is to this branch of the case that the principal arguments of the plaintiffs’ counsel have been directed. The positions maintained are: first, that the. legislature cannot constitutionally establish a new civil division of the state for general and permanent purposes of civil government ; and, second, that to establish such a district, and to organize therein officers for the appointment, regulation and government of the police force, and a body of policemen, deriving their appointment from the central authority of the state, is hostile to the power of election and appointment conferred upon counties and cities by the above mentioned second section of the tenth article of the constitution.
First. The established divisions of the state into counties, cities, towns and villages are, as it is correctly stated, repeatedly recognized by the constitution. The constitutional directions respecting the appointment of officers are based upon and require the continual and permanent existence of these divisions. It cannot be denied that an act of the legislature which should propose to abolish counties would be hostile to the arrangements of the constitution. There are a great many provisions of that instrument, to the execution of which counties are indispensable. Members of the assembly are required to be apportioned among the counties; electors must be inhabitants of counties; county boards are required to form assembly districts. There are to be county judges and county courts. The boards of supervisors, which are county authorities, may be made the recipients of a portion of the legislative power. Cities and towns are also included in and are indispensable to the car tying out of the arrangements of the government as organized by the constitution. But there is nothing in it which requires that these local divisions should always possess the *542 same measure of administrative power, or that local functionaries should always exist within them, possessing the same functions as when the constitution was adopted. The counties and cities must not only be preserved, but the legislature must do nothing respecting them which will render them less suitable for the purposes for which they are recognized and employed by the constitution. All the arrangements to which counties and cities are subservient or instrumental, or in which their agency is contemplated,' must have their free course unobstructed and unembarrassed by legislation. But the act under consideration does not propose to abolish any of these divisions. On the contrary, the existence of counties and cities embraced in the metropolitan district is recognized; and their continued existence is as essential to the arrangements of the act as to the working of the constitution itself. No subordinate officers or patrolmen of the police force can be appointed, and no funds for their payment can be furnished without the cooperation of the county and city authorities. Counties and cities, then, are not subverted by this act. Nor can I perceive that any arrangement of the constitution which looks to the existence of counties or cities, or the cooperation of county or city authorities, is broken in upon, or in any respect, interfered with by the bill. It may be said that, as matters of police have generally been of local cognizance, an act which shall unite for police purposes several counties and cities, causes the local divisions to be less distinctly defined; and this is true. But this, if it proves anything, proves too much. The argument would stamp the distribution of administrative authority among the local divisions with the attribute of absolute permanency. Every change in this respect would intensify or detract from the distinctness with which these divisions were marked when the constitution was framed. Within our recollection, the arrangements for the support of the poor, have been the subject of changes which have taken power from the county authority, and given it to the towns, and *543 the reverse. District attorneys were once appointed for several counties. Afterward one was appointed for each county. The same features are found in respect to common schools. In the, administration of this system, both town and county agencies are employed; but changes are often made, by which power is taken from the one and given to the other. If we were to establish the principle' that the legislature can never reduce the administrative authority of counties, cities or towns; can never resume, in favor of the central power any portion of the jurisdiction of those local divisions, or change the partition of it among them, as it existed when the constitution was- adopted, we should, I think, make an impracticable government. It is the business of the legislature to adjust, in the interest of the whole people of the state, the distribution of the powers of government ; taking care that np direct provision of the constitution is violated, and that no arrangement which it has made is incidentally disturbed. We do not find that an organization like the metropolitan district is anywhere forbidden; and we are unable to see that any arrangement of the machinery of the government which the constitution has provided will be impeded or disturbed by the execution of the act. We conclude, that the act is constitutionally valid, so far as this objection is concerned. „ ,
Before preceding to the other ground of objection, it will be useful to state certain principles which, though not controverted, have sometimes been overlooked in this argument. In the first place, the people, in framing the constitution, committed to the legislature the whole law making power of the state, which they did not expressly or impliedly withhold. Plenary power in the legislature for all purposes of civil government is the rule. A prohibition to exercise a particular power is an exception. In inquiring, therefore whether a given statute is constitutional, it is for those who question its validity to show that it is forbidden. I do not mean that the power must be expressly inhibited, for there *544 are but few positive restraints upon the legislative power contained in the instrument. The first article lays down the ancient limitations which have always been considered essential in a constitutional government, whether monarchial or popular; and there are scattered through "the instrument a few other jarovisions in restraint of legislative authority. But the affirmative prescriptions, and the general arrangements of the constitution, are far more fruitful of restraints upon the legislature. Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision. The frame of the government; the grant of legislative power itself; the organization of the executive authority; the erection of the principal courts of justice, create implied limitations upon tire law making authority as strong as though a negative was expressed in each instance; but independently of these restraints, express or implied, every subject within the scope of civil government, is liable to be dealt with by the legislature. As it may act upon the state at large, by laws affecting at once the whole country, and all the people, so it may in its discretion, and independently of any prohibition, expressly made or necessarily implied, make special laws relating to any separate district or section of the state. As a political society, the state has an interest in the repression of disorder, and the maintenance of peace and security in .every locality within its limits; and if from exceptional causes, the public good requires that legislation, either permanent or temporary, be directed toward any particular locality, whether consisting of one county or of several counties, it is within the discretion of the legislature to apply such legislation, as in its judgment, the exigency of the case may require; and it is the sole judge of the existence of such causes. The representatives of the whole people, convened in the two. branches of the legislature, are, subject to the- exceptions which have been mentioned, the organs of the public will in every district or locality of the *545 state. It follows that it belongs to the legislature to arrange and distribute the administrative functions, committing such portions as it may deem suitable, to local jurisdictions, and retaining other portions to be exercised by officers appointed by the central power, and changing the arrangement from time to time, as convenience, the efficiency of administration and the public good may seem to require. If a particular act of legislation does not conflict with any of the limita.tions or restraints which have been referred to, it is not in the power of the courts to arrest its execution, however unwise its provisions may be, or whatever the motives may have been which led to its enactment. There is room for much bad legislation and misgovemment within the pale of the constitution; but whenever this happens, the remedy which the constitution provides, by the opportunity for frequent renewals of the legislative bodies, is far more efficacious than any which can be afforded by the judiciary. The courts cannot impute to the legislature any other than public motives for their acts. If a given act of legislation is not forbidden by express words, or by necessary implication, the judges cannot listen to a suggestion that the professed motives for passing it are not the real ones. If the act can be upheld upon any views of necessity or public expediency, which the legislature may have entertained, the law cannot be challenged in the courts. It may be proper to make one other remark of a general character. It has been said that a tendency may be discovered in the constitution, toward local administration, and in favor of decentralizing, as it is not inaptly called, the powers of government; and that a policy in that direction, more marked than in any of our former systems, is plainly to be traced in several constitutional provisions. This I believe to be true. So far as the convention has proceeded in that direction, it is for the courts to follow; and it may be that in the construction of doubtful provisions, regard should be had to this political tendency. But we cannot, in furtherance of such a supposed policy, *546 however plainly it may be perceived, create exceptions or restraints on the legislature, which are not fairly contained in the constitution as it is written. It may be the duty of the legislature to follow out or advance such a line of policy, but the business of the courts is with the text of the fundamental law as they find it. They have no political maxims and "no line of policy to further or to advance. Their j duty is the humble" one of construing the constitution by the language it contains.
Second. These general remarks lead me to the consideration of the last ground of objection to the act under examination. It is said that, by the provisions of the act, the local constituency of the city of New-York is deprived of the rights secured to it by the second section of the tenth article of the constitution already quoted. It is suggested that the constitution is to be taken to have assumed the subject of police to be localized in the several cities and counties. Then as its administration was committed to certain city and county officers when the constitution was framed, and the second section above mentioned determined, in effect, that these county and city officers should forever thereafter be elected or appointed by a local constituency, it is argued that no change can be made by the legislature by which that constituency can be deprived of the franchise of choosing its officers of police. This position would be unassailable if it could be maintained that the object of police had, by any constitutional provision or arrangement, been irrevocably committed to the counties and cities. But there is nothing in the constitution directly touching the subject of police. If such a provision exists, it must, therefore, be an implied one, and nothing is suggested from which it can be implied, unless it is the provision that county and city officers shall be chosen in the counties and cities. But' this does not prove that the then existing functions of county and city officers were always to continue and to be performed in the cities and counties. No one will contend that the *547 legislature could not abolish the office and the functions of any officer whose office was not a constitutional one, but was one created simply by a legislative act. Should they . determine to-day that the office of public administrator, or street commissioner, or any other officer whose office was not established by the constitution, had become unnecessary or useless, they could abolish the office and the functions together. Should they determine that the functions of public administrator, for instance, should be no longer local, but that convenience would be promoted by establishing an office having the same powers, with a jurisdiction coextensive with the state, there is nothing in the constitution to prohibit such an act of legislation. But suppose it should be considered that public convenience would be promoted by the establishment of such an office, with jurisdiction over the maritime counties of the state only. In neither case, as I conceive, would there be any constitutional objection to giving effect to the views of the legislature, by an act which should enlarge the territorial jurisdiction and change the mode of appointment. The local constituency would in the cases supposed become inapplicable. The constitutional provision would no longer meet the case, and it would be left to the legislature to provide such mode of appointment as it should judge expedient. Now, in the case before us, the legislature must be considered to have determined that public con venience and the public good would be promoted by abolishing the local character of the police of the four counties mentioned in the bill, and creating a new jurisdiction embracing them all. The defendants’ counsel explained the strong public necessity which he supposed there was for the new arrangement. With this question we have nothing to do ; but certainly it is not impossible to suppose . that there might be adequate public motives for the consolidation of the police force of the four counties. If such motives could in the nature of things exist, we are to assume for the purposes of this question, that they did exist. Where. *548 then, is the prohibition in the constitution forbidding the abolition of the local police arrangements of the city of New-York? It cannot be implied from the suffrage conferred upon the people and local authorities to choose the police officers while they are local. This would subordinate the public necessities and interests, which might lead to the abolition of the local office, to the franchise vested in the locality of selecting the officer. But the more just view is that the franchise was created on account of the public interests connected with the office, and not that the office was created on account of the franchise. The public benefits resulting from the office lead to the creation of the local constituency. When it is determined, by the authority to which the constitution has committed the solution of such questions, that the offices, as county offices, are no longer necessary or expedient, we cannot say that they must be continued as county offices in order that the constituency shall not be disappointed in the enjoyment of the franchise.
Some subordinate questions have been argued, but the views expressed, if correct, dispose of the case. We are of the opinion that the judgment of the Supreme Court should be affirmed, and it is accordingly affirmed.
Shankland, J.
The act of the legislature, entitled “An act to establish a Metropolitan Police District and to provide for the government thereof,” is, by these proceedings, alleged to be unconstitutional. That act having received the sanction of the legislature and of the executive department of the government, is clothed with all the forms of law. Never- theless, if its provisions are, directly or by necessary implication, repugnant to the constitution, it is the province and duty of the courts so to declare it. But if the law should be found to be within the competency of the legislature, however much we may doubt the policy or wisdom of the enactment, it is our duty to uphold it and vindicate the legislative power. It is needless to say the judicial records *549 of this court show that we have never shrunk from the performance of this duty on just occasions.
The constitution vests all legislative power in the senate and assembly, with certain restrictions and limitations imposed on that body by the constitution itself. Independent of those limitations, the legislative power is omnipotent within its proper sphere. The legislature, in this respect, is the direct representative of the people, and the delegate and depositary of their power. Hence, the limitations of the constitution are not so much limitations of the legislature as of the power of the people themselves, self-imposed by the constitutional compact. When the court declares a law unconstitutional, it in effect declares that the sovereign power of the people’has so far been abdicated by themselves. This consideration has led the courts, in all governments which are based on the theory that all power resides in the people, to give a strict construction to compacts which deprive the people of this sovereign power. It will not be presumed that they intended to abdicate their power, unless they have so declared in express terms or by necessary implication. These principles are fundamental, conservative, and cannot be disregarded without infringement upon the reserved rights and power of the people. Hence, the courts have frequently and uniformly declared that they will not adjudicate a law unconstitutional when it is to be made so by inferences or presumptions only, or when the question rests in doubt. Any other rule of construction would bring the legislative and judicial branches of government into collision, to the ruin of one or both.
The wisdom of the conservative maxims of the courts is further exhibited by the consideration that the legislatures are chosen at frequently occurring elections and for short terms. Hence, if they err in expressing the wants of the people, or exceed their powers, the error or excess may be quietly and quickly corrected by the people themselves, through subsequently elected representatives. But if this *550 court wanders from its judicial orbit, and in its progress collides with a coordinate power, when moving in its legitimate sphere, who shall restore the system to harmony and regulate its dynamical forces ? Such collision must terminate either in judicial revolution or new constitutional compacts.
The appellant’s counsel base their objection to the law mainly upon its supposed repugnancy to the second section-of the tenth article of the constitution, which declares that “ All county officers, whose election or appointment is not provided for by this constitution, shall be elected by tbe electors of the respective counties, or appointed by the boards of supervisors or other county authorities, as the legislature shall direct. All city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof as the legislature shall designate for that purpose. All other officers, whose election or appointment is not provided for by this constitution, and all officers whose offices may be hereafter created by law, shall be elected by the people or appointed as the legislature may direct.”
This objection, when reduced to its last analysis, is, that the officers, created by the act in question, should have been directed to be elected by the people of the district cf appointed by the local authorities thereof; and as it does not, but confers that power upon the executive of the state, it violates the constitution in respect to the mode of appointment. To this objection it is answered, that these officers are neither county, town, city or village officers, but paramount, in respect of territorial limits and jurisdiction and duties, to any of them.
We are of opinion this answer is legitimate. The limits of the metropolitan police district extend to, and embrace four counties, including two large and contiguous cities, and intervening rivers and harbors. Within this extended dis *551 trict, all the lesser "civil divisions of the state are, for the purposes of police regulation and action, obliterated, but left intact for all other governmental purposes; and the several divisions elect or appoint their local officers as heretofore. We cannot say, therefore, that the provisions of the constitution, in this respect, have been disturbed. Indeed, it is certain they have not. But it is said that if the legislature may erect new districts of territory, other than those mentioned in the constitution, they may defeat the intention of that instrument, in respect to the mode of electing or appointing to office. This argument may have much force to prove the constitution defective in its provisions against its own subversion by the people themselves, by virtue of their reserved legislative power. But it does not advance one step in proving the power or duty of this court to interpose the judicial shield between the people and the constitution, when the latter has been left defective, either intentionally or inadvertently. We cannot make judicial supplements to that solemn compact. We are the depositaries of no such power. But the possibility of infringing upon the existing manner of electing or appointing officers is greatly overstated by counsel. In all the three great departments of government, the executive, legislative and judicial, the offices, and the mode of electing the officers to fill them, are fixed by the constitution in such clear and definite language as to exclude all other offices and modes of appointment in competition with, or substitution for them. It declares that the legislative power of the state shall be vested in a senate and assembly. (Art. 3, § 1.) The executive power shall be vested in a governor, (Art. 4, § 1), and the whole judicial power is so parceled amongst the several courts, and the mode of selecting the judges by election so specifically pointed out, that no doubt can exist, that, not only the mode of selecting the officer, but the duty of the officer, is exhaustive of that function of government, and excludes all idea of a reserved power on this subject, save
*552 as provided by the twenty-third section of the' sixth article, in respect of the creation of tribunals of conciliation, and section five of the same article, which confers upon the legislature power to “ alter and regulate the jurisdiction -and proceedings in law and, equity, as they had possessed it theretofore.” So, in respect of the officers of state, such as secretary, comptroller, treasurer, attorney-general, state engineer and surveyor, canal commissioners, inspectors of state f prisons, &c., the mode of appointment, and in most cases the duties of the office are fixed, and cannot be altered, or transferred, or abolished by the legislature. So, too, the several counties have the imperative right to choose sheriffs, clerks, coroners and district attorneys, every three years. (Art. 10, § 1.) These offices cannot be abolished, therefore, nor the mode of their appointment changed. Nor can the common law duties pertaining to those offices, so far as the names of the officers are descriptive of them, be abrogated in any material respect or transferred to others. ( Warner v. The People, 2 Denio, 275.) I know the court seem to admit, in the case above cited, that the legislature might abolish the office of clerk, or transfer a portion of his duties to another officer. However it might be held, under the constitution of 1821, in respect to abolishing the office, the present constitution, by its tenth article, would seem to confer a perennial power upon the counties, and to command its exercise “ Sheriffs, &c., shall be chosen once in three years, and as often as vacancies shall happen.”
This review of the constitution, from the standpoint of fear of its subversion, ought to remove the excessive alarms of those who tremble for its safety. If some small modicum of power to appoint to office is left in the executive, its exercise will not be felt in its contact with the great mass of power conferred by election and local appointments.
We have, thus far, examined the constitution for the purpose of finding an express or necessarily implied prohibition of the legislation in question ; and, having found none, the *553 constitutionality of the law follows as a necessary result. But this does not exhaust the subject, nor do justice to the other side of the question, viz., the affirmative power implied in the last clause of the second section of the tenth article : to create new offices and to direct the mode of their appointment. By that clause of the constitution, “ all other officers whose election or appointment is not provided for by this ’ constitution, and all officers whose offices may hereafter be created by law, shall be elected by the people, or appointed as the legislature may direct.” This clause provides for two contingencies: First. Officers whose offices were created or recognized as existing by the constitution, but whose mode of induction was not prescribed by that instrument; and, Secondly. Offices newly created by the legislature, other than county, town, city and village offices. These provisions make it evident, the. people, in adopting the constitution, meant to reserve to themselves, through their immediate representatives, the right to create new offices to meet the wants and exigencies of a great and growing state. The wise and experienced statesmen who framed and recommended this provision for adoption, well knew that no human provision could foresee all the wants and dangers of twenty years of the future, for which time they hoped the instrument they had formed might endure. (Art. 13, §2.) The science of sociology teaches the wisdom of such a provision, in all forms of government which hope for perpetuity. When the whole frame of government is cast in an iron mould, every desire of renovation is treason, and every change is revolution. Hence, to allow a verge for unforeseen contingencies is wisdom, as flexibility is strength.
Upon this construction of the constitution, the legislature have acted, ever since its adoption; by creating the offices of pilots; commissioners for almost every conceivable object, both general and local; harbor masters; auditor of the canal department; state reporter; wreck-masters; notaries public, and numerous others. The power of creating new offices *554 and filling them by appointment by the governor, in conj unction with others, was exercised by the first legislature convened under the constitution, and has never been questioned in the courts until now. If the power were doubtful, contemporaneous construction, and continued action under it without objection, go far-to prove the assumed construction to have been legitimate and in harmony with the other provisions of the instrument, in the judgment of the people.
But it is said that the offices heretofore created by the legislature were mere agencies, ephemeral in duration and insignificant in power. If this were so, it would- not vary the question, nor validate the inference sought to be drawn from it. The question is one of power, and not its abuse or excess. But an examination of the various offices, above referred to, will prove that, both in importance and duration, if they do not equal they do not much fall short of those created by the police act.
Another argument urged by the appellant’s counsel is, that if the last clause of the second section has reference to local offices or officers (which they deny), then the words, “ by the authorities thereof,” should be interpolated after the word “ appointed,” so as to confine the power of appointment to the local authority of the city or village. But this construction ought not to prevail, for two reasons: First. It is evident the constitution was not intended to limit the power of appointment to the local authority, or the framers would have inserted the limitation which we are asked to interpolate, and which the framers had just used, in the preceding clause. They understood the value and power of words; and, in a document of so solemn a character, must be deemed to have both weighed and counted them. The omission of those words of limitation is therefore expressive of an intent not to confine the appointing power to the local authority.
The second answer to this argument is, that the last (lause of the section did not confine its provisions, to local offices *555 only, but had in contemplation all officers, whether general or local, whose election or appointment has not already been provided for in the constitution; and also officers to fill offices thereafter to be created, other than county, town, city and village offices. But, as this argument was not much pressed, I will not further answer it, or do more than allude to the dangerous consequences of interpolating new provisions into a fundamental law.
The appellants’ counsel further urge that the law in question was enacted by the legislature, in the form it is, to evade the constitutional provisions, but in fact to deprive the city of New-York of the right to. choose their own police officers, and to draw patronage to the central power. These are grave charges, and, if true, subject the individual members of that body to impeachment. I will not say that a law may not be so palpably evasive of constitutional provisions, that it would be the duty of the courts to pronounce the law void; not, however, because the legislature intended to evade, while they violated, its provisions, but because they had not succeeded in the evasive effort. We are not made judges of the motives of the legislature; and the court will not usurp the inquisitorial office of inquiring into the bona fides of that body in discharging its duties.
Looking at the provisions of the act, and comparing them with the offices heretofore existing prior to the constitution, they create offices heretofore unknown, in respect to territory, powers, duties, duration, succession and combination. It is true there had existed officers prior to the constitution, who performed similar duties in limited sections of this whole territory; but no one of them, nor all combined, had the powers conferred by this act. The power and facilities afforded by this act seem well calculated to effectuate the great objects of a police force; and if the right of election or appointment of this force had been conferred upon the local authorities, I doubt not it would have been hailed by *556 the citizens of New-York as a well devised law, adapted to . their pressing wants. But being a newly created office, and other than a county, town, city or village office, I am clearly of the opinion the legislature could direct the mode of the appointment.
Of one thing I am fully persuaded. If the legislature had not, in this case, the power to create new offices, tinder the clause of the constitution before cited, no cases can possibly arise which will authorize them to do so.
The city of New-York is the commercial metropolis of this continent; its port is filled with shipping from every clime; its streets crowded with residents and sojourners, intent on business, pleasure and crime; and through its gates, into the interior of the state, come swarming myriads of emigrants, from every kindred, tongue and people of the old world. And how have the local authorities of that great city discharged its duty of local government to its citizens and the state at large, in protecting them in their liberty, life and -property? Let the statistics‘of crime answer, and convict that authority, either of remissness in duty, or the system of police hitherto in force as radically defective. But let the cause be what it may, which has paralyzed the arm of criminal law, the state is bound to protect the citizen in his life and property, irrespective of locality; and if, in the judgment of its representatives, the local authorities have failed to accomplish this object, it was their duty to substitute another system more effectual in execution.
There is no error in the judgment, and it should be affirmed.